## FREDERICK H. BUDD v. C. THOMAS STORES SALES SYSTEM, INC. AND ANOTHER.[1]

March 7, 1941.

No. 32,619.

*George R. Smith, M. Arnold Lyons, Edward J. Callahan, Joseph A. Kozlak,* and *George P. Mavrelis,* for relator.

*Reynolds & McLeod,* for respondents.

GALLAGHER, CHIEF JUSTICE.

*Certiorari* to review an order of the industrial commission denying relator's claim for compensation.

[1]Reported in 296 N. W. 571.

Relator was employed as manager of a C. Thomas store in Minneapolis. At about seven o'clock in the evening of April 7, 1939, while standing behind the cash register "checking up" for the day, he dropped a piece of paper on the floor. He claims to have sustained the injury here involved when he stooped to pick it up. We can best describe the incident by quoting from relator's testimony given on direct examination.

Q. "Can you describe any more in detail just how you stooped down to pick up this paper?

A. "Well, I can show you, I just stooped over like this, as you ordinarily would, and I get this intense pain in my knee.

The Referee: "Let me describe that for the record—will you do that again?

A. "You bet.

Q. "You had your right knee on the floor?

A. "I believe it was to the floor; if not, it was almost to the floor.

Q. "With your foot out behind you?

A. "Yes.

Q. "And then you buckled your left knee?

A. "My left knee, and that is when I got this intense pain in the knee.

Q. "In your left leg? You squatted down with your heel touching your thigh?

A. "That is right. Well, I don't know if I was that far, no. But in that direction, just in that direction.

Mr. Hazen: "And at what point in the stoop did you first notice this pain, if you recall?

A. "Well, it was when I got pretty near down to the floor.

Q. "Was it a severe pain or moderate pain?

A. "Yes, it was quite severe.

Q. "As I understand, this paper you stooped down to pick up was one you had been working with?

A. "One I had been working with. I don't remember whether it was scrap paper or a piece of tape out of the machine now, one of the two.

Q. "And what did you do after you felt that pain?

A. "Well, I straightened up with the assistance of this Mr. Schopf, and then after I straightened up I had hold of the counter and I walked in the back of the store and sat down for a while."

Relator further testified that after the sharp pain subsided he experienced a dull ache in the knee, which continued until after the removal of the cartilage about three weeks later. There was a momentary recurrence of the sharp pain on two or three occasions before he entered the hospital and twice while in bed in the hospital.

Relator consulted Dr. Roberts on April 9, 1939, and a few times during the following week. The doctor was of the opinion that a cartilage in the knee was injured. He bandaged the knee with Ace bandages. Relator continued his work for several days. On April 19, 1939, he entered the hospital and was operated on by Dr. Hoaglund on the 26th. The doctor described the operation thus:

"At the operation, I made a small incision two inches long over the inner side of the knee, and in making this incision I very carefully went through the tissues to be sure that I wouldn't miss any signs of acute injury, and as I came down to the capsule of the knee joint there was a distinct edema, that is, a swelling, of the capsule, which is something that occurs on injury, bruising. I opened up this swollen capsule and then I discovered that there was a split in the semilunar cartilage, it was definitely torn across for an area of about an inch. The cartilage was loose. The anterior three-quarters of this cartilage, including the torn piece, was removed. The capsule of the joint was then closed and the knee was closed and an Ace bandage was applied to the knee and a splint was put on to keep it straight, during the period of healing. Now, the interesting thing about this particular case was that there was a definite tear in the cartilage, and that isn't any

conjecture, that is something that was visible to the assistants and myself and everybody in the operating room."

Relator was able to get around on crutches a few days after the operation and left the hospital about May 10. Shortly thereafter he developed phlebitis, an inflammation of the blood vessels, in his left thigh. This retarded improvement so that he was still totally disabled at the time of the hearing although his doctors predicted further improvement and eventual recovery. No opinion was given as to when this would be.

It is conceded that the injury occurred in the course of the employment. The only question is whether it arose out of the employment. The determination of that question depends upon the weight to be given the medical testimony.

Dr. Hoaglund testified that he examined relator about April 20, 1939. He found tenderness over the inner side of the knee, moderate swelling of the joint, and discomfort when rotating the knee. He came to the conclusion that relator had an injured semilunar cartilage and that an operation was necessary. Upon operation, as disclosed by the testimony referred to, the doctor found a dislocated and torn semilunar internal cartilage of the left knee.

Dr. Hoaglund was of the opinion that when relator went through the motion of stooping down he twisted the cartilage in his knee and tore it. He attributed the pain experienced by relator at the time to the twisting and tearing and was of the opinion that the condition of relator's knee was due to what occurred on the evening of April 7. Dr. Roberts, the attending physician, was of the same opinion.

Dr. Feeney and Dr. Moe testified for respondents. The former based his testimony on an examination of relator after the operation, on the hospital record, and on the testimony given at the trial by relator and his witnesses. He was of the opinion that it would be impossible to detach a cartilage in the manner described by relator. It was Dr. Feeney's opinion that the injury to the cartilage occurred at a prior date, that it may have been of long origin, and that the pain experienced by relator on the evening

of April 7 and on subsequent occasions was the result of the cartilage being pinched between the lower end of the femur and the upper end of the tibia. He testified that in his opinion there was no association between the condition of relator's knee and the incident of April 7.

Dr. Moe, basing his testimony entirely upon hypothetical questions, was of like opinion.

On these conflicting opinions, the referee disallowed compensation, as did the commission. That being the situation presented to us, we must affirm, as we have so often done in the past under the rules referred to in such cases as Jones v. Excelsior Laundry Co. 183 Minn. 531, 237 N. W. 419; Krueger v. King Midas Mill. Co. 169 Minn. 153, 210 N. W. 871; Gaetz v. City of Melrose, 155 Minn. 330, 193 N. W. 691; State ex rel. Niessen v. District Court, 142 Minn. 335, 172 N. W. 133; State ex rel. Rinker v. District Court, 142 Minn. 420, 172 N. W. 311.

We have not overlooked the point so forcibly presented by relator in reference to the apparent inconsistency in the testimony of respondents' expert, Dr. Feeney. However, all of the testimony and the weight to be attached to it was for the triers of fact, and we cannot say that it was not entitled to the credibility given to it by the referee and by the commission.

The writ is discharged and the order affirmed.